In re Julia M. WALKER and Otis Walker, Debtors.

TRUST COMPANY BANK, Plaintiff,

v.

Julia M. WALKER and Otis Walker, Defendants.

Bankruptcy No. 83–01284A.
Adv. No. 83–1770A.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Nov. 28, 1983.

---

Morton P. Levine, Levine, D'Alessio, Mullins & Stone, Atlanta, Ga., for plaintiff.

Michael R. Hurst, Atlanta, Ga., for defendants.

## ORDER

W. HOMER DRAKE, Bankruptcy Judge.

The debtors, Otis and Julia M. Walker, filed their Chapter 13 petition on March 17, 1983. The Trust Company Bank ("Bank") commenced this adversary proceeding to lift the stay on July 21, 1983 to collect receivables owing to Mr. Walker under a certain contract purportedly assigned to the Bank as security for a loan. On August 19, 1983, the debtors answered the complaint and counterclaimed to compel turnover of funds held by the Bank. The Bank responded to the counterclaim on August 29, 1983, and on September 21, 1983, the instant motion for summary judgment was filed.

The question for resolution on this motion for summary judgment is the Bank's entitlement to over $8,000, otherwise due the debtors under contract, pursuant to an "Assignment of Accounts Receivable and Contract Rights" and a "Security Agreement", both of which were executed by Mr. Walker in favor of the Bank, and a U.C.C. Financing Statement filed by the Bank.

## FACTS

On November 2, 1979, Mr. Walker borrowed money from the Trust Company Bank. On the date this first loan was

made, Mr. Walker executed the aforementioned assignment, which states as follows:

> In consideration of Bank's extension of credit to the assignor [Mr. Walker], assignor hereby sells, assigns, and transfers to Bank, its successors and assigns, all of assignor's right, title and interest in and to *all accounts receivable and contract rights which assignor now has or may hereafter acquire,* the proceeds thereof, any security or guaranty thereon, and all right, title and interest in merchandise covered by said accounts or contract. Said sale, assignment and transfer are *made as collateral security* for any and all liabilities and obligations of assignor to Bank, whether now existing or hereafter incurred . . . (emphasis added).

Mr. Walker also executed a security agreement on November 2, 1979, which describes the collateral as "Assignment of Contract, Atlanta Housing Contract". The Bank filed the U.C.C. Financing Statement on December 18, 1979, which describes the collateral as "Contract from E.H. Crump Company, Inc. (supported by a contract from Atlanta Housing Authority)". To fully understand these documents, a brief explanation of Mr. Walker's business is necessary.

Mr. Walker works part time as an independent casualty/property insurance broker. However, he handles certain accounts on a joint venture basis with the E.H. Crump Company of Georgia, Inc., Insurance Agents and Brokers ("E.H. Crump"). One such account handled by Mr. Walker and E.H. Crump as joint venturers is with the Atlanta Housing Authority ("AHA"). Mr. Walker and E.H. Crump were under contract to broker liability insurance coverage to AHA for the years 1978–1980. As between Mr. Walker and E.H. Crump, Mr. Walker was to receive 30% of the gross commissions paid by AHA for those three years. After 1980, when AHA's contract with the Walker-E.H. Crump joint venture expired, AHA solicited new bids for its liability insurance coverage. As a result of the rebidding, the Walker-E.H. Crump joint venture was again awarded the Atlanta Housing Authority contract, this time through July, 1984.

On August 16, 1982, Mr. Walker borrowed $13,623.06 more from the Bank. The note, signed by Mr. Walker, was not paid on the November 15, 1982 due date. On March 22, 1983, five days after the Walkers filed for relief under Chapter 13, the Bank sent a letter to E.H. Crump requesting that money due Mr. Walker under the joint venture agreement be paid directly to the Bank. As of September 1, 1983, Mr. Walker was due $8,312.10 from E.H. Crump. This money, presently in possession of the Bank, is the focus of the instant controversy.

By affidavit of Robert E. Lambertson, Vice President of the Trust Company Bank, Atlanta office, the Bank shows that the principal balance outstanding on the note is $13,100.48. Interest through July 20, 1983 totaled $1,939.00 and accrues at $5.74 per day.

## SECURITY INTEREST

Although the debtors raise arguments to the contrary, the Court concludes that the Bank holds a perfected security interest in the payments under contract by E.H. Crump to Mr. Walker for his 30% share of the gross commissions earned by the joint venturers on liability insurance coverage provided to AHA.

The assignment executed on November 2, 1979 serves as a valid security agreement, regardless of the fact that Mr. Walker also executed a document specifically entitled "Security Agreement" on the same date. The assignment, by its express terms, covers all contracts which the assignor "now has or may hereafter acquire". Further, the assignment was made "as collateral security" for Mr. Walker's obligations to the Bank, then existing or later incurred.

The assignment meets all the criteria for a valid security agreement under Georgia law. A security agreement need not be in any particular form. The requirements are as follows: (1) There must be a writing; (2) The language must reflect an intent to create a security interest; (3) The writing must reasonably describe the collat-

eral; and (4) The agreement must be signed by the debtor. *Personal Jet, Inc. v. Callihan,* 624 F.2d 562, 568 (5th Cir.1980). Clearly, the first and fourth criteria are met, as the assignment was in writing and was signed by Mr. Walker. As reproduced in the preceding paragraph and *supra* at page 2, the assignment identifies the accounts receivable and contract rights as collateral securing obligations to the Bank, thus satisfying the second and third criteria of a security agreement.

■ Arguably, the debtors are correct in their contention that the 1979 "Security Agreement", describing collateral as the "Assignment of Contract, Atlanta Housing Contract", became ineffective when the first three-year contract with the AHA expired at the end of 1980. However, the broader language in the assignment encompasses the subsequent contract between the Walker-E.H. Crump joint venture and AHA. Hence, the ineffectiveness of the "Security Agreement" is immaterial to the Bank's rights under the assignment and U.C.C. Financing Statement.

For the reasons set forth immediately below, U.C.C. Article 9 applies to this transaction; and the Bank perfected its security interest by filing the U.C.C. Financing Statement on December 18, 1979. Section 9–102(1)[1] provides that Article 9 applies

(a) To any transaction (regardless of its form) which is intended to create a security interest in ... accounts; and also

(b) To any sale of accounts ...

In § 1–201(37),[2] "security interest" is defined to include "any interest of a buyer of accounts ... which is subject to Article 9." "Account" is defined in § 9–106[3] as

any right to payment for ... services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

Section 9–104(f),[4] not applicable to this case, carves a limited exception to the general rule of 9–102(1)(b) that Article 9 applies to the sale or assignment of accounts.

Section 9–302[5] mandates a U.C.C. filing to perfect all security interests, except as provided in subsection (1) of that same section. Section 9–302(1)(e)[6] excepts from the filing requirement

[a]n assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor.

Since the Bank did file a financing statement, the Court need not consider the applicability of this exception.

Moreover, the Court rejects the contention of the debtors that the financing statement does not sufficiently describe the collateral as required by § 9–402(1).[7] The standard is that a description of the collateral must "reasonably identify" the collateral. U.C.C. § 9–110;[8] see *Stephens v. Bank of Camilla,* 133 Ga.App. 210, 210 S.E.2d 358 (1974), *affirmed on other grounds,* 234 Ga. 293, 216 S.E.2d 71 (1975) (description stating "five leases on equipment; (see file) Proceeds and Products" held legally sufficient); *Selmer v. Thomas (In re Beverage),* 30 UCC Rep. 373 (B.C.M. D.Ga.1980) (description stating "accounts receivable, inventory, etc. present and future," sufficient to describe after-acquired inventory).

Having determined that the Bank has a perfected security interest in the $8,312.10 presently in its possession, the Court now turns to the impact of the Bankruptcy Code on the Bank's security interest.

## VALIDITY OF SECURITY INTEREST AS TO POST–PETITION PAYMENTS

The affidavit of the debtors states that all payments to Mr. Walker by E.H. Crump

---

1. Official Code Ga.Ann. § 11–9–102(1) (1983).

2. Official Code Ga.Ann. § 11–1–201(37) (1983).

3. Official Code Ga.Ann. § 11–9–106 (1983).

4. Official Code Ga.Ann. § 11–9–104(e) (1983).

5. Official Code Ga.Ann. § 11–9–302 (1983).

6. Official Code Ga.Ann. § 11–9–302(1)(e) (1983).

7. Official Code Ga.Ann. § 11–9–402(1) (1983).

8. Official Code Ga.Ann. § 11–9–110 (1983).

from the AHA account have, since 1978, been made by checks jointly payable to Otis Walker and the Trust Company Bank. Other than the last check for $8,312.10, which has been retained by the Bank, the checks were endorsed by the Bank and released to Mr. Walker. The narrow issue remaining is whether the filing of bankruptcy by the assignor affects the Bank's rights as a duly perfected assignee so as to prevent the Bank from withholding the $8,312.10 and any future commission checks that might be paid to Mr. Walker by E.H. Crump.

*Harris v. Farmers Home Administration (In the Matter of Bargstedt),* 7 B.R. 556 (Bkrtcy.M.D.Ga.1980), held that a written assignment of monies due or to become due removed the assigned property from the debtor's estate and beyond the reach of the trustee in bankruptcy. Arguably, *Harris* supports the Bank's position, but that case is distinguishable.

In *Harris,* the FHA made loans to the debtors on February 22, 1978 and January 2, 1979. Those loans were secured by the debtors' farm, cattle and equipment. On May 1, 1978, the debtors assigned to FHA $4,100.00 per month of the purchase price due or to become due on milk supplied by the debtors to Dairymen, Inc. Under the assignment, payments were to be made by Dairymen, Inc. directly to FHA. The dispute in *Harris* concerned one such $4,100.00 payment made post-petition.

*Harris* unequivocally stated that:

In Georgia, a written assignment of monies due or to become due is valid. *United States v. Mercury Motor Express, Inc.,* 294 F.Supp. 919 (S.D.Ga.1968).

*Id.* at 557. Concluding that the $4,100.00 was not property of the estate, *Harris* further stated:

The assignment in question being properly executed, the debtors could not have claimed title to the property in question and neither can the trustee in bankruptcy.

*Id.*

The distinguishing feature in *Harris* is that the assignment was not made as part of the security agreement between the debtors and FHA. Therefore, the *Harris* assignment was more like a sale than a security interest. Under Georgia law,

[n]o special form of words is necessary to make an assignment. Any language, however informal, if it shows an intention of the owner of the chose in action to transfer it, will be sufficient to vest the property in the assignee.

*Southern Mutual Life Insurance Assoc. v. Durdin,* 132 Ga. 495, 498, 64 S.E. 264 (1932). Whereas the debtor-assignor in *Harris* intended an outright transfer of his right to payments from the obligor (Dairymen, Inc.), Mr. Walker simply assigned his right to payment from the obligor (E.H. Crump) for the Bank to hold "as collateral security". Mr. Walker did not intend to transfer ownership rights at the time of the assignment. Accordingly, this Court holds that the money held by the Bank is property of the debtors' estate in which the Bank holds a perfected security interest.

Another case has been reported which treats an assignment as a lien rather than a sale. *First National Bank of Lafayette v. Texas Tri-Collar, Inc. (In re Texas Tri-Collar),* 8 CBC 2d 970, 29 B.R. 724 (Bkrtcy.W.D.La.1983). *Tri-Collar* held that a pre-petition assignment of accounts receivable is voidable under § 552(a) of the Bankruptcy Code as to receivables generated post-petition.

The *Tri-Collar* Court stated that

[a]pplicable state law classifies this type of assignment as a pledge or lien rather than a completed sale. *La.Rev.Stat.Ann.* art. 9, § 3102(B).

In establishing that the other elements of § 552(a) were met, the Court added that the assignment was an agreement to create a lien or, in other words, a "security agreement" per § 101(37) of the Bankruptcy Code, and the Court implicitly held that the post-petition receivables were property "acquired by the estate or by the debtor after the commencement of the case."

Section 552(a) of the Bankruptcy Code provides as follows:

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

As in *Tri-Collar,* the "assigned" property in the instant case was subject to a lien rather than sold. Hence, the check paid by E.H. Crump was: (1) acquired by the estate or by the debtor. Further, the check was: (2) acquired after the commencement of the case; and (3) subject to a security agreement entered into before the commencement of the case.

Having determined that § 552(a) applies, the Court must look at subsection (b), which excepts from the lien avoidance provision of subsection (a) "proceeds, product, offspring, rents, or profits" of property acquired before the commencement of the case. Without elaborating upon each of these categories, the Court holds that the payment under contract of earned real estate commissions is property acquired by the debtor's estate which is not within the exceptions of § 552(b).

The conclusions of this Court are consistent with the policy of the Bankruptcy Code that the debtor be afforded an opportunity for a "fresh start". *Local Loan Company v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Mr. Walker's assignment of future insurance commissions is analogous to the debtor's assignment of future wages in *In re Soto,* 667 F.2d 235 (1st Cir.1981). *Soto* held that an assignment of future wages as security for a prepetition debt was rendered ineffective by § 552(a) of the Bankruptcy Code.

In accordance with the foregoing, the Bank must endorse and turn over to the debtors the $8,312.10 check from E.H. Crump and all other commission checks which the Bank may receive during the pendency of the Walkers' Chapter 13 case.

IT IS SO ORDERED.